IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Kenneth S. Sales,<br><br>        Plaintiff,<br><br>v.<br><br>Res-Care, Inc.,<br><br>        Defendant(s). | C/A. No.:<br><br><br>**COMPLAINT**<br>(**JURY TRIAL DEMANDED**) |

## EMPLOYMENT CASE

  Plaintiff, Kenneth S. Sales, complaining of Defendant, Res-Care, Inc. (hereinafter, "Res-Care"), would respectfully show unto the Court the following:

## INTRODUCTION AND JURISDICTION

  1. This action is brought pursuant to Title VI and VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981, and the common law of South Carolina.

  2. Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, which gives the federal courts jurisdiction over any action authorized by law to be commenced by any person to recover damages under any Act of Congress enacted for the protection of civil rights.

  3. Venue lies within the Columbia Division pursuant to 28 U.S.C. § 1391, because the the Defendant operates a for-profit business in this judicial division and all the circumstances giving rise to this action occurred in Richland County, within the Columbia Division.

  4. Plaintiff, Kenneth S. Sales (hereinafter, "Plaintiff" or "Mr. Sales") timely filed a charge of discrimination with the South Carolina Human Affairs Commission (hereinafter,

"SHAC") on April 23, 2018. SHAC issued Plaintiff's Notice of Right to Sue on August 28, 2018, and this action is timely.

5. Plaintiff demands a trial by jury on all claims brought herein.

## PARTIES

6. Plaintiff, Kenneth S. Sales, is a 40-year-old African American male who is a citizen and resident of Richland County, state of South Carolina.

7. At all times relevant hereto, Mr. Sales was employed by Defendant until his termination on January 24, 2018.

8. Defendant is a duly organized corporation operating under the laws of the state of South Carolina and conducts business in Richland County. Defendant provides workforce service development to facilitate providing local businesses with qualified job seekers, as well as training job seekers to meet the requirements of the businesses. Defendant's four South Carolina locations receive federal funding through the Workforce Innovation Opportunity Act to provide training for South Carolina residents.

## FACTUAL ALLEGATIONS

9. Mr. Sales began working for Defendant in July 2017, as a Project Director/Operator in Defendant's Columbia office. His duties included managing the day-to-day operations of the Defendant's Columbia location, fiscal management for the Midlands region and monitoring the Defendant's partners compliance with the Workforce Innovation Opportunity Act.

10. Mr. Sales has had no prior disciplinary infractions throughout his tenure of employment with Defendant.

11. In July of 2017, Mr. Sales began requesting that his office location be provided with an in-house Human Resources representative because the Defendant did not provide him with proper human resources training.

12. Defendant's other South Carolina workforce centers, including Catawba, Greenville and Spartanburg, were each provided with in-house Human Resource representatives.

13. Defendant denied each of Mr. Sales' requests purportedly because of budgeting limitations.

14. Although Mr. Sales notified Res-Care that he did not have Human Resource training, Defendant forced Mr. Sales to take on the duties without providing any additional training ~~above~~ beyond the one day of training with regional director Rochelle Brown.

15. Defendant's agent, Rochelle Brown, provided one of Mr. Sales' female counterparts, also employed as a project director, with two days of on-site human resources training and sent the operator/project director from the Catawba site to provide her with additional human resources training.

16. On or around January 3, 2018, Mr. Sales was notified by another employee of Defendant, Temecca Belcher, that her subordinate, an African-American female, and Res-Care employee named Tequilla Murphy, filed a sexual harassment complaint against a white male employee, David Lamb.

17. Tequilla Murphy was Mr. Lamb's immediate supervisor in the youth services division of Res-Care's Columbia office.

18. Having no on-site HR representative, on or around January 4, 2018, Mr. Sales conducted a soft investigation into the alleged sexual harassment, to include individual meetings with Ms. Murphy and Mr. Lamb.

19. During the individual meeting with Ms. Murphy, Mr. Sales verified the facts from her written statement she provided to her immediate supervisor Ms. Belcher.

20. Mr. Sales also stated and that there is zero-tolerance for sexual harassment and assured her that the matter would be fully investigated.

21. At or around 4:30 p.m. on January 4, 2018, Mr. Sales met with Mr. Lamb, and Mr. Lamb admitted to having an inappropriate conversation with a male coworker about Ms. Murphy's prior sexual relationship and sexual activities with the coworker.

22. Mr. Lamb informed Mr. Sales that he felt comfortable engaging in the conversation because he and Ms. Murphy had often discussed her sexual relationships and that she routinely flirted with him in the workplace.

23. At or around 8:30 a.m. January 5, 2018, Mr. Sales notified Defendant's regional Human Resources Manager, Lisa Giacco of Ms. Murphy's sexual harassment allegation complaint.

24. Ms. Giacco instructed Mr. Sales to obtain a written statement from the two parties and forward them to her office for her review.

25. Mr. Sales notified Ms. Giacco that he had a written statement from Ms. Murphy and was awaiting a written statement from Mr. Lamb.

26. Ms. Giacco instructed Mr. Sales to conduct further investigations into the sexual harassment complaint on behalf of Defendant's Corporate HR department and to obtain additional written statements from both Ms. Murphy and Mr. Lamb, specifically stating that neither of them would retaliate against the other employee in connection with the harassment complaint.

27. At or around 10:00 a.m. on January 5, 2018, Mr. Sales notified Ms. Murphy that Defendant's corporate HR department requested an additional "no retaliation" letter.

28.     Ms. Murphy became upset with Mr. Sales and stated that she felt she was being treated as the perpetrator and was being harassed by Res-Care because of the requirement to write a "no retaliation" letter.

29.     At or around 11:00 a.m. on Friday, January 5, 2018, Mr. Sales notified Ms. Giacco that Ms. Murphy was unwilling to write the "no retaliation" letter because she felt that the Defendant was trying to minimize her sexual harassment claim against Mr. Lamb.

30.     Ms. Giacco instructed Mr. Sales that the "no retaliation" letter was needed in order to proceed with the sexual harassment investigation.

31.     At or around 6:00 p.m. on Friday January 5, 2018, Ms. Sales called Rochelle Brown to update her on the progress of the investigation and again complained about the lack of in-house HR support to assist with the sexual harassment investigation.

32.     On or around January 8, 2018, Mr. Sales received the "no retaliation" letters from Ms. Murphy and Mr. Lamb.

33.     Mr. Lamb, through his "no retaliation" letter, made his own sexual harassment allegations against Ms. Murphy, who was his direct supervisor.

34.     At or around 1:00 p.m. on January 8, 2018, Mr. Sales called Ms. Giacco and informed her that Ms. Murphy was becoming increasingly combative towards him and had told other coworkers that she was not speaking to him because of the investigation.

35.     Mr. Sales also notified Ms. Giacco that Mr. Lamb's "no retaliation" letter contained sexual harassment allegations against Ms. Murphy concerning several occasions where she had inappropriately touched him and discussed with him her sexual encounters with other men.

36. On or around January 9, 2018, Mr. Sales sent Ms. Giacco his entire investigative file related to Ms. Murphy's sexual harassment complaint and Mr. Lamb's subsequent complaint against Ms. Murphy.

37. On or around January 12, 2018, Ms. Giacco informed Mr. Sales that she would conduct a telephone investigation with Ms. Murphy and Mr. Lamb, and instructed Mr. Sales to notify her if either party was discussing the matter with other employees.

38. At or around 2:00 p.m. on January 12, 2018, Mr. Sales notified Ms. Giacco that he was informed by another employee that Ms. Murphy was discussing the sexual harassment investigation with her, and a fellow coworker, Natasha Brooks.

39. Later, on January 18, 2018, the same employee informed Plaintiff that during the conversation on January 12, 2018, Ms. Murphy specifically asked Ms. Brooks to falsely accuse Mr. Sales of sexually harassing her, if or when she was interviewed by Ms. Giacco, in order to support her new sexual harassment complaint against him.

40. On or around January 15, 2018, Ms. Rochelle Brown notified Mr. Sales that Lisa Giacco would be visiting his Columbia location to conduct further investigation into Ms. Murphy's sexual harassment complaint against Mr. Lamb.

41. On January 15, 2018, at or around 10:00 a.m. Ms. Giacco arrived at the Columbia location to begin her face to face investigation, which concluded on January 16, 2018.

42. On January 16, 2018, at or around 9:00 a.m. Ms. Giacco met with the Plaintiff to discuss her investigation.

43. Ms. Giacco notified the Plaintiff that she interviewed four employees – Temecca Belcher, Natascha Brooks, Tequilla Murphy and David Lamb – concerning Ms. Murphy's complaint against Mr. Lamb.

44. Ms. Giacco informed the Plaintiff that Mr. Lamb admitted to sexually harassing Ms. Murphy. Ms. Giacco also informed Plaintiff that she was able to substantiate Mr. Lamb's claim of sexual harassment against Ms. Murphy.

45. Ms. Giacco informed the Plaintiff that Mr. Lamb would receive a written reprimand in his employee personnel file for his sexual harassment against Ms. Murphy, and that Ms. Murphy would not receive any discipline for her harassment of Mr. Lamb.

46. Ms. Giacco then requested the Plaintiff to write a more detailed account of his investigation process and his findings related to Ms. Murphy's initial harassment complaint against Mr. Lamb.

47. At or around 4:30 p.m. the Plaintiff provided Ms. Giacco with the requested written statement.

48. After reviewing Plaintiff's statement, Ms. Giacco informed the Plaintiff that Ms. Murphy had filed a subsequent complaint against Plaintiff alleging that he sexually harassed her while conducting his initial investigation.

49. Ms. Giacco was unable to substantiate Ms. Murphy's sexual harassment allegations against the Plaintiff, however, she informed him that Ms. Brooks indicated that she would be uncomfortable working around the Plaintiff, if Ms. Murphy's sexual harassment allegations against him were found to be true.

50. Ms. Giacco immediately suspended the Plaintiff, without pay while, she conducted further investigation into Ms. Murphy's sexual harassment complaint against him.

51. Ms. Giacco informed the Plaintiff that, because he was a supervisor, he was being suspended to prevent any retaliation towards Ms. Murphy.

52. At or around 6:00 p.m., Ms. Giacco instructed the Plaintiff to collect his personal items and she escorted him off of the Defendant's property, in the presence of his fellow coworkers.

53. On January 24, 2018, Plaintiff received an email from Lisa Giacco notifying him that his employment with the Defendant was terminated based on the results of her investigation into Ms. Murphy's sexual harassment allegations against him.

54. Plaintiff filed an official grievance with Defendant on February 2, 2018, requesting a review of the investigation's findings and reconsideration of his termination. Plaintiff followed Defendant's grievance procedure as outlined, however, Defendant provided no response to Plaintiff's written appeal to Defendant's Vice President, as required by the 4th step of Defendant's grievance procedure.

55. On April 23, 2018, Plaintiff filed a formal discrimination complaint with the South Carolina Human Affairs Commission, and on August 28, 2018, Plaintiff received his right to suit letter.

## **FOR A FIRST CAUSE OF ACTION**
**(Violation of Title VII, Race Discrimination)**

56. Where not inconsistent herewith, the Plaintiff repeats and realleges the foregoing allegations as if repeated fully and completely verbatim herein.

57. Plaintiff was subjected to unlawful discriminatory actions on the basis of his race; such treatment was disparate, discriminatory and perpetrated by the Defendant.

58. A similarly situated white employee of the Defendant, David Lamb, was accused of sexual harassment by the same alleged victim but received less severe disciplinary action, and such constitutes discrimination violation of Title VII.

59. Plaintiff was terminated on the basis of his race, the Defendant's asserted non-discriminatory reason for terminating Plaintiff was false and pretextual and the same also violates Title VII.

60. The Defendant is liable for all damages suffered by the Plaintiff that were incurred by the violations of Title VII alleged herein as it directly and proximately caused the same.

61. As a direct and proximate result of the Defendant's violation of Title VII, Plaintiff has suffered and is entitled to lost wages, back pay, front pay, lost benefits, embarrassment, humiliation and emotional distress. Plaintiff is further entitled to an award of reasonable attorney's fees and costs.

## FOR A SECOND CAUSE OF ACTION
### (Violation of Title VI, Race Discrimination)

62. Where not inconsistent herewith, the Plaintiff repeats and realleges the foregoing allegations as if repeated fully and completely verbatim herein.

63. The Defendant is, and was at all time relevant to this Complaint, a beneficiary of millions of dollars in federal funding from the Department of Labor under the Workforce Innovation Opportunity Act.

64. The policies and practices of the Defendant alleged herein amount to unlawful discrimination on the basis of race including disparate treatment, discrimination on basis of sex and intentional race discrimination.

65. The Defendant, as a recipient of federal funding and assistance, is bound by Title VI of the Civil Rights Act of 1964 and is liable to the Plaintiff for its actions in violation of the same and for all damages directly and proximately caused thereby.

66. As a direct and proximate result of the Defendant's race discrimination the Defendant is liable for and the Plaintiff is entitled to recover lost wages, back pay, front pay, lost

benefits, embarrassment, humiliation and emotional distress. Plaintiff is further entitled to an award of reasonable attorney's fees and costs, as well as, any and all remedial action as justice requires as authorized by Title VI.

## FOR A THIRD CAUSE OF ACTION
### (Violation of § 1981, Race Discrimination)

67. Where not inconsistent herewith, the Plaintiff repeats and realleges the foregoing allegations as if repeated fully and completely verbatim herein.

68. Plaintiff was denied the equal enjoyment of the benefits, privileges, terms and conditions of his contractual employment relationship with the Defendant because of his race.

69. Additionally, Defendant, by and through its employees and agents, impaired Plaintiff from receiving such equal treatment under his contract of employment because of his race.

70. Plaintiff was subjected to more severe discipline and punishment than was the white employee, David Lamb, who was accused of committing the same offense against the same female employee.

71. Defendant subjected Plaintiff to adverse employment actions and treated him differently because of his race. Specifically, Plaintiff was subjected to severe and pervasive discriminatory misconduct by Defendant and its agents and employees when he was suspended without pay and later terminated from employment.

72. Plaintiff exhausted his administrative remedies by following Defendant's grievance procedure, yet Defendant failed to remedy the situation and upheld Plaintiff's unlawful termination.

73. These acts are contemptable in a civilized society, and constitute a violation of 42 U.S.C. § 1981, as amended, which prohibits race discrimination in any contract in America, including employment, by employers like Defendant.

74. As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered wage loss, benefit loss, been degraded, humiliated, embarrassed, and will continue to suffer shame and humiliation, loss of enjoyment of life and other actual harm to be shown to the triers of fact.

75. As a direct and proximate result of Defendant's race discrimination the Defendant is liable for and the Plaintiff is entitled to recover his actual damages, compensatory damages, lost wages, back pay, front pay, lost benefits, and equitable relief for his embarrassment, humiliation and emotional distress, as well as, any and all remedial action as justice requires as authorized by § 1981.

76. Further, Plaintiff contends the actions by Defendant were willful, intentional and in flagrant disregard of the law. Therefore, Plaintiff is entitled to punitive damages to the fullest extent of the law, litigation costs and attorney's fees pursuant to 42 U.S.C. § 1988, and such other and further relief as available as a result of this intentional conduct.

### FOR A FOURTH CAUSE OF ACTION
**(Defamation)**

77. Where not inconsistent herewith, the Plaintiff repeats and realleges the foregoing allegations as if repeated fully and completely verbatim herein.

78. The Defendant, by and through its agents and employees, have defamed the Plaintiff and ratified the conduct of such agents and employees of the Defendant.

79. Plaintiff was arbitrarily removed from the Defendant's premises by Defendant's regional human resources manager at the direction of the Defendant for the sole purpose of harming his reputation.

80. Defendant's agents and employees discussed allegations of sexual harassment against the Plaintiff, which they knew, should have known, or with reasonable investigation could have determined were blatantly false.

81. Plaintiff's termination, forcible removal, and representations that Plaintiff was guilty of sexual harassment and incompetent in his profession have been published and republished by employees of the Defendant to co-employees, without justification, and to the public at large.

82. Such publications made by the Defendant, by both word and act were false, known to be false by the Defendant, were malicious, and amount to actionable *per se* defamatory insinuations to his coworkers and the public at large that Plaintiff is unfit for his profession and has engaged in inappropriate activities.

83. That as a direct and proximate result of the aforesaid defamation Plaintiff's reputation has been damaged and the Defendant is liable for Plaintiff's reputational loss, emotional distress, mental anguish, humiliation and embarrassment and Plaintiff has also suffered the loss of future earnings; furthermore, Plaintiff is also entitled to an award of punitive damages for the willful, wanton, mean-spirited and intentional defamation of him by Defendant's agents and employees.

### FOR A FIFTH CAUSE OF ACTION
(Civil Conspiracy)

84. Where not inconsistent herewith, the Plaintiff repeats and realleges the foregoing allegations as if repeated fully and completely verbatim herein.

85. Defendant by and through Defendant's employees, namely, Lisa Giacco, Tequilla Murphy and Natascha Brooks, have met, conspired and schemed to cause the Plaintiff harm.

86. Defendant's employee, Lisa Giacco, acting within the scope of her employment, but in abuse of her position, conspired with Ms. Murphy and Ms. Brooks, who were acting outside the scope of their employment, against the Plaintiff to have him terminated on baseless grounds and tarnish his reputation within the workforce development profession.

87. These acts were perpetrated with the overt purpose of harming the Plaintiff and assisting Ms. Murphy in gaining an advantage in the investigation of her complaint alleging sexual harassment against the Plaintiff.

88. That such treatment of the Plaintiff by the Defendant's employees was motivated by an intent to harm Plaintiff for their own personal agendas, personal benefit, and to protect themselves from due criticism.

89. Such actions of the Defendant by and through its employees have isolated and damaged the Plaintiff in his field of service and employment and has inflicted special damages upon him in so doing.

90. The foregoing conduct amounts to an unlawful civil conspiracy to deprive the Plaintiff of his rights and to specifically harm the Plaintiff for which the Defendant is liable.

91. Said civil conspiracy has directly and proximately caused the Plaintiff to be ostracized, isolated and essentially black-listed in his profession; it has caused the Plaintiff to suffer increased stress and anxiety, a loss of companionship with his wife and family, and forced him to incur reasonable attorney's fees for prosecuting this action.

92. Additionally, Plaintiff's blacklisting, prevented him finding reemployment in the workforce development and economic development fields, which resulted in him defaulting on his Court Ordered child support obligations and losing custody of his daughter.

93. Upon information and belief, the Plaintiff's ability to obtain employment in the workforce and economic development fields has been diminished because of the Defendant's conspiracy, which was willful and wanton, and Plaintiff is entitled to an award of punitive damages for the malicious, intentional mean-spirited actions of the Defendant by and through its employees.

**WHEREFORE**, Plaintiff prays for judgment, as determined by a jury, against the Defendant Res-Care, for its Racial Discrimination and Sex Discrimination of Plaintiff, in violation of Title VI and Title VII, with all lost earnings, benefits, back pay and front pay and other damages alleged therein and caused thereby. Plaintiff also prays for the reasonable attorney's fees and costs associated with these claims; as well as, any and all remedial action as justice requires.

    Respectfully Submitted:

    DUFF & CHILDS, L.L.C.

    By: s/David N. Lyon
        William C. Freeman, Esquire (FED. I.D. #11906)
        David N. Lyon, Esquire (FED. I.D. #12095)
        P.O. Box 1486
        Columbia, SC  29202
        Telephone: (803) 790-0603
        Facsimile: (803) 790-0605
        Email: wfreeman@duffchilds.com
        Email: dlyon@duffchilds.com

    Attorneys for Plaintiff, Kenneth S. Sales

December 27, 2018
Columbia, South Carolina